UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LESLIE VILLA,

Petitioner,

v.

JOHN HENLEY,[1] *et al.*,

Respondents.

Case No. 2:21-cv-02030-ART-MDC

ORDER

Leslie Villa filed a first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 27. After a Nevada jury found him guilty, he was sentenced to life imprisonment with the possibility of parole after five years for first-degree kidnapping, and consecutive imprisonment for 24 to 60 months for domestic battery (strangulation) and battery causing substantial bodily harm. ECF No. 20-15. In the remaining grounds of his petition,[2] Villa alleges his constitutional rights were violated by (1) prosecutorial misconduct in opening and closing argument, (2) failure to preserve evidence, and (3) ineffective assistance of trial counsel. ECF No. 27. The Court denies the petition and grants a certificate of appealability for Ground 1.

## I.    Background

Ashley Castillo was a police dispatcher in Nye County, Nevada, who lived with Villa from 2003 until their relationship ended in October of 2011. ECF No.

---

[1] Villa is currently incarcerated at Northern Nevada Correctional Center ("NNCC"). *See* NDOC Inmate Search. John Henley is the warden for that facility. *See* Northern Nevada Correctional Center Facility | Nevada Department of Corrections. At the end of this Order, the Court directs the Clerk of the Court to substitute Villa's current immediate physical custodian, John Henley, as Respondent in lieu of Respondent William Hutchings. *See* Fed. R. Civ. P. 25(d).

[2] The Court previously dismissed Grounds 2, 4(A), and 4(C). ECF No. 48 at 8.

20-7 at 91–92, 130. On May 3, 2012, Villa, who is tall and weighed about 400 pounds, forcefully entered Castillo's home, "twisted" her arm behind her back, and shoved her down the hallway to her bedroom. *Id.* at 91, 94–97, 152–53. Villa shoved Castillo on her bed, punched her in the face and head, and told her he was going to "kill" her and "dump" her in the desert. *Id.* at 98–100. She reached for her cellphone, but Villa grabbed it and threw it against the wall. *Id.* Villa found duct-tape and unsuccessfully attempted to duct-taped her arms together. *Id.* at 100–01, 162. Castillo attempted to flee, and Villa slammed her to the ground causing the back of her head to strike the tile floor. *Id.* at 100–01, 162–63. When Castillo attempted to get up, Villa pushed her against the wall, put his arm around her neck from behind, began choking her, and lifted her up until her feet no longer touched the ground. *Id.* at 102. She could not breathe, he told her to go to sleep, asking why she would not "just die," and she fainted. *Id.* at 102–03.

Castillo awoke with Villa's elbow pinning her head down "in the center console" of his car. *Id.* at 104. With a free arm, she ripped the rear-view mirror off the windshield to hit Villa with it. *Id.* at 105. Villa screamed and told Castillo he was "going to have to do it now for sure" and was taking her to the desert. *Id.* at 106. Castillo grabbed the steering wheel and tried to crash the car, but Villa bit her arm. *Id.* at 106–07. Villa told Castillo he was doing this to her because she didn't want to be with him anymore and she had been with somebody else. *Id.* Castillo convinced Villa to take her to his parents' house. *Id.* at 107–10. Villa's father asked Villa why he attacked Castillo, and Villa paced "back and forth in the kitchen," repeating "I don't know." *Id.* at 111.

Villa's father took Castillo to the hospital. *Id.* at 112. Castillo had a headache, her neck and the whole right side of her body hurt, and it hurt to swallow. *Id.* at 114. Nurse Maryann Dion observed Castillo had "quite a bit of bruising: Face, head, neck, chest, legs, arms," behind her ears, on her back, including a bite mark on her right deltoid, circumferential bruise around her right

wrist, and petechiae (burst blood vessels) in her eyes. ECF No. 20-8 at 174–75, 178, 180, 184. Nye County Sheriff Detective Eric Murphy photographed Castillo's injuries. *Id.* at 20–31. The hospital conducted a CAT scan of Castillo's neck and arm and referred her for follow up with her primary doctor. ECF No. 20-7 at 115. Her primary doctor referred her to an ophthalmologist because her right eye turned inward toward her nose preventing her from driving a vehicle for about a week. *Id.* at 115–16. The doctor concluded it was caused by a concussion. *Id.* at 116–17. At the time of trial, Castillo had constant right hip pain that worsened when she walked or stood for long periods. *Id.* at 117–18.

Nye County Sheriff Deputy Cory Fowles arrested Villa during a traffic stop on the night of the incident. *Id.* at 246. Fowles did not observe any signs Villa was under the influence of a stimulant; rather, Villa appeared "pretty calm and straight." *Id.* at 248–49. When Detective Murphy arrived at the scene of the stop, he noticed Villa was "sweaty," which "could be" a symptom of stimulant use, but did not notice other symptoms of stimulant use, e.g., fidgetiness or restlessness. ECF No. 20-8 at 15–16, 66.

At around 3:00 p.m., the next day, Nye County Sheriff Detective Michael Eisenloffel interviewed Villa. *Id.* at 139–40. Eisenloffel testified he minimized the allegations to elicit statements from Villa. *Id.* at 159. Eisenloffel told Villa he never knew him as violent; he knew him as a "mellow guy," and something must have "snapped." *Id.* at 159–62. During the interview, Villa was "calm," "collected," "cooperative," spoke "reasonably" and understood their conversation. *Id.* at 157.

Villa admitted to Eisenloffel that he found duct-tape in Castillo's room and duct-taped her hands together, because "she wouldn't be quiet for even a moment to listen to him." *Id.* at 144–45. Villa admitted he choked Castillo from behind "by placing her head in a headlock" until she "passed out." *Id.* at 143–44. He admitted he dragged Castillo to his vehicle and dropped her on her face on the cobblestone driveway. *Id.* Villa gave Eisenloffel several admissions and reasons for his actions:

> [I]n regards to why he wrapped her hands up with duct tape, he explained that he was upset because she wouldn't be quiet for even a moment to listen to him. He just wanted her to be quiet and listen to him. And he explained that the reason he wrapped her hands up with duct tape was in order to accomplish that goal and get her to be quiet, sit down and listen to him.
>
> . . . .
>
> [H]e acknowledged that he made a statement [that he would kill her and take her out to the desert and bury her]. In fact, he called it one of the stupidest things he had said or done in his entire life.
>
> . . . .
>
> [H]e indicated that he was emotional, he was angry . . . [H]e had taken pills. He indicated that he wanted her to just stop yelling at him. And he repeated that several times. He just wanted her to stop yelling at him.
>
> . . . .
>
> [H]e indicated that he was regretting everything. And he further indicated that he was upset because he had learned that she had an intimate relationship with another man.
>
> . . . .
>
> He indicated to me that he had—right after the act at one point in time contacted an attorney who had advised him that what he had done was a result of the pills. At the end of the statement, however, he added that—or he indicated that that wasn't the case. That, in fact, it had been all him.

*Id.* at 146–47.

Villa was charged by amended information with (1) attempted murder; (2) first-degree kidnapping resulting in substantial bodily harm; (3) domestic battery (strangulation); (4) battery causing substantial bodily harm; and (5) burglary. ECF No. 19-14. A jury acquitted Villa of attempted murder and burglary and found him guilty of first-degree kidnapping, domestic battery (strangulation), and battery causing substantial bodily harm. ECF No. 20-11.

## II.    Governing Standards

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

4

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to established Supreme Court precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409–10). A state court need not cite Supreme Court cases or be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). The petitioner carries the burden of proof. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen*, 563 U.S. at 181 (internal quotation marks and citations omitted) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt"). To obtain habeas relief, a prisoner must show the state court's ruling on claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Under 28 U.S.C. § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "If [r]easonable minds reviewing the record might disagree about the [finding in question], . . . on habeas review that does not suffice to supersede the [state] court's . . . determination." *Davis v. Ayala*, 576 U.S. 257, 274 (2015) (internal quotation marks and ellipsis omitted) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). "Under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Wood*, 558 U.S. at 293.

### III.   Discussion

#### A.   Ground 1—Prosecutorial Misconduct in Argument

Villa alleges his rights to due process and a fair trial were denied when the prosecutor engaged in misconduct in opening and rebuttal argument. ECF No.

27 at 5–9. Respondents contend Villa cannot establish the state supreme court's resolution of the claim was objectively unreasonable or that the remarks denied him a fair trial. ECF No. 51 at 6–10. Villa claims the prosecutor's actions denied him a fair trial because they had a substantial and injurious effect on the jury's verdict. ECF No. 55 at 27–28. Because Villa made differing allegations of prosecutorial misconduct to the state courts and in his petition, the Court subdivides for clarity its analysis of the claims.

### 1.   Additional Background

In closing remarks, defense counsel argued, although he was not saying the Nye County Sheriff's Department was "bad," he questioned whether the detectives conducted "good police work," whether the Sheriff's Department should have hired an "independent agency to investigate," because Castillo was their colleague, and counsel argued the testimony of each law enforcement witness indicated they neglected to look for or obtain evidence helpful to the defense because they had Villa's confession and were investigating a crime against a coworker. ECF No. 20-9 at 76–77, 80–82, 84–103. Defense counsel reiterated this was domestic battery, the State overcharged Villa, and the jury must decide whether Villa engaged in strangulation or not. *Id.* at 72–73, 130–31.

The prosecutor responded in relevant part during rebuttal:

> I was pretty entertained by that closing. I could have sworn that [defense counsel] was actually arguing that maybe this didn't happen. That is the most preposterous thing I've seen in a long time. No evidence? Underinvestigated? Really? I think this was a thorough and thoughtful investigation on behalf of the sheriff's office.
>
> . . . .
>
> You can take about 80 percent of that closing that you heard from the defense and toss it right out window [sic] as pure speculation. Kept talking about maybe this, maybe that.
>
> . . . .
>
> Instruction 33 basically explains why you should toss out most of the rest of the defense's closing. It's because you're only here to decide the innocence or guilt of the defendant. He wants you to put

the cops on trial and say, why didn't they do this? Why didn't they do that?

. . . .

Just look at that evidence. Don't sit there and think, how can I get a more perfect police force? They do this to us at just about every trial, try to make it about anything but whether the defendant is innocent or guilty. There were so many red herrings thrown out up here that we could open up a fish market.

Just sweep that all aside. This is about this defendant.

. . . .

He talked to you a lot about the lesser included instructions, and I want to make this real simple for you. I would invite you and encourage you to go through and literally mark every box on that verdict form that says guilty. Just mark every single one. And here's why. You think we overcharged attempted murder? There's no doubt this was a battery. He beat [Castillo] half to heck. There's no doubt they were previously in a dating relationship. So we know it's domestic. There's no doubt he choked her. Battery plus a domestic relationship plus choking equals domestic battery by strangulation, so we know he did that. Go ahead and check the guilty box on that. So there's no doubt it's battery, there's no doubt it caused substantial bodily harm. I've never been knocked out for enough time for somebody to transport me out of my house, into a car. You wake up, you don't even know where you're at. She's still hurting. It's two years later. It's definitely substantial bodily harm, so we know he's guilty of battery causing substantial bodily harm. Go ahead and check that guilty box, too.

Battery with specific intent to kill. We know he battered the hell out of her, telling her the whole way that he was going to kill her and bury her in the desert. Go ahead and check that box off right next to attempt murder. He's guilty of attempt murder, and it is just one of the most clear cases that I've ever seen of that.

So just rifle right through those. Give them the time and deliberation they deserve. But when you get to that verdict form, don't be afraid, just check every single one of those. Because he did all of that. This whole nonsense about, well, if he committed the attempt murder he couldn't have committed the other stuff? Oh, yeah, he committed all that other stuff because it's a lesser included. He committed it on his way to attempting to murder her. He committed it in the course of attempting to murder her. Just check every single one guilty.

First degree kidnapping with substantial bodily harm. There's no doubt that was false imprisonment. He confined her and detained her without legal authority for sure. He detained her. She tried to get out of her house, he ran her down and then choked her out right by her front door. There's no doubt it rises to the level of second degree. Because he took, he carried her away against her will. Loaded her into his car and drove her out. He wasn't going to the hospital. That's

a bunch of malarky. He was going to the desert. She knew. She testified she knew she wasn't going to the hospital. She knew she wasn't going to his parents' house.

That statement on closing? That was pretty funny about how, well, he was taking her to the hospital in a roundabout way. Roundabout way after he decided finally not to kill her. There's no doubt it rises to second degree. It absolutely rises to first degree because of what I just said right there. He told her he was going to kill her and bury her in the desert. That's probably the most obvious form of first degree kidnapping ever. Take somebody with the intent to kill them, commit substantial bodily harm on them. He is no doubt guilty of kidnapping her in the first degree.

. . . .

*Id.* at 136, 145–52.

### 2. Standards for Evaluating Prosecutorial Misconduct

Prosecutorial misconduct warrants federal habeas relief if the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and internal quotation marks omitted). The standard is general, leaving courts "more leeway . . . in reaching outcomes in case-by-case determinations . . .." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough*, 541 U.S. at 664).

To determine whether a prosecutor's comments rise to the level of a due process violation, courts examine the prosecutor's remarks in context based on the entire proceedings. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

If there is constitutional error, the error warrants relief if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (citation and internal quotation marks omitted); *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). Factors to consider when determining whether a prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the comment misstated or

manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

### 3.    State Court Determination

On direct appeal, the Nevada Supreme Court (NSC) determined the prosecutor committed misconduct by injecting his personal opinion, view of certain facts, belief the case was a clear instance of attempted murder, and by urging the jury to disregard the instructions and find Villa guilty of each offense *and* its lesser-included offenses; however, it concluded the remarks did not prejudice Villa because overwhelming evidence supported Villa's guilt, and the jury rejected the prosecutor's opinion by acquitting Villa of attempted murder and completing the verdict form in accordance with jury instructions:

> [V]illa argues that the State committed misconduct in its closing argument. The court follows a two-step approach in assessing claims of prosecutorial misconduct: we first determine whether the conduct was improper, and if so, we then determine whether reversal is warranted. *Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). The court reviews unpreserved error for plain error affecting the appellant's substantial rights by causing "actual prejudice or a miscarriage of justice." *Id.* at 1190, 196 P.3d at 477. Deputy District Attorney Michael Vieta-Kabell undeniably committed prosecutorial misconduct both in injecting personal opinion by stating his personal view of certain facts and his belief that the case contained a clear instance of attempted murder, *see Collier v. State*, 101 Nev. 473, 480, 705 P.2d 1126, 1130 (1985), and in urging the jury to disregard its instructions and find Villa guilty of each offense *and* its lesser-included offenses, *see State v. McCorkendale*, 979 P.2d 1239, 1252–53 (Kan. 1999), *disapproved of on other grounds by State v. King*, 204 P.3d 585 (Kan. 2009). However, Villa has failed to show that this error affected his substantial rights because overwhelming evidence supported Villa's guilt and the jury rejected Vieta-Kabell's personal opinion by acquitting Villa of attempted murder and properly completing its verdict form in accordance with the jury instructions. Thus, we conclude that Villa has failed to show that Vieta-Kabell's misconduct warrants relief.

ECF No. 20-30 at 4.

#### 4.    Analysis of Ground 1(A)—Remarks on Instructions/Guilt

The NSC was objectively reasonable in its application of the *Brecht* prejudice analysis to the prosecutor's misconduct in remarks about his opinion as to Villa's guilt, lesser-included offenses, and the jury's handling of the verdict form. *See, e.g., Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding misconduct did not violate due process where trial court instructed that attorneys' statements were not evidence and there was substantial evidence of the defendant's guilt).

First, the jury was instructed that "statements, arguments and opinions of counsel are not evidence in the case." ECF No. 20-9 at 36; *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Second, the jury acquitted Villa of attempted murder despite the prosecutor's opinion that Villa was guilty of that charge. ECF No. 20-11. Third, the verdict form demonstrates the jury rejected the prosecutor's arguments urging the jury to check guilty for each of the charges. *Id.* Fourth, the jury's verdict did not conform to the prosecutor's argument about lesser-included offenses and burglary because the jury acquitted Villa of burglary and convicted Villa of first-degree kidnapping instead of first-degree kidnapping resulting in serious bodily injury. *Id.* Finally, as explained below, the evidence supporting the three counts of conviction was overwhelming.

The jury was read the charges and instructed on the requirements for first-degree kidnapping resulting in substantial bodily harm, domestic battery (strangulation), and battery causing substantial bodily injury, including the lesser-included offenses, and the special requirements for convicting Villa of first-degree kidnapping along with domestic battery (strangulation) and battery causing substantial bodily harm. ECF No. 20-9 at 23–31.

The NSC was objectively reasonable in its determination that the prosecutor's remarks did not have a substantial and injurious effect on the

11

determination of the verdict for first-degree kidnapping, including the requirement that, e.g., the movement or restraint had an independent purpose or significance. Castillo testified Villa twisted her arm behind her back, forced her down the hall and onto the bed in her bedroom, attempted to bind her arms, and told her he planned to "kill" her and "dump" her body in the "desert." Villa confessed to binding her hands with duct tape so she could not leave and dragging her unconscious body to his vehicle and driving away. And Castillo testified that when she awoke in the car, Villa bit her arm during a struggle. There was also ample evidence and testimony corroborating Castillo suffered injuries that matched these events.

The NSC was objectively reasonable in its determination that the prosecutor's remarks did not have a substantial and injurious effect on the determination of the verdict for domestic battery (strangulation). Defense counsel conceded Villa committed a domestic battery and Castillo testified, and Villa admitted, that Villa choked Castillo from behind "by placing her head in a headlock" until she "passed out."

Finally, the NSC was objectively reasonable in its determination that the prosecutor's remarks did not have a substantial and injurious effect on the determination of the verdict for battery causing substantial bodily harm. Even apart from the chokehold and strangulation until Castillo fainted, Villa punched her in the face and head in the bedroom, slammed her to the ground causing the back of her head to strike the tile in another location, shoved her against a wall, dropped her in the driveway, and bit her arm. Castillo testified she not only experienced a protracted loss or impairment of her eye for about a week during which she could not drive, but prolonged physical pain, i.e., hip pain that continued until the time of trial.

Thus, the NSC was objectively reasonable in its application of clearly established federal law as determined by the Supreme Court and determination

12

of the facts considering the evidence presented during the state court proceedings. Ground 1(A) is therefore denied on deferential review.

### 5.  Analysis of Ground 1(B)—Opening and Additional Rebuttal

In his first amended petition, Villa raised additional facts that he did not present to the state courts in support of his assertion of prosecutorial misconduct. *See* ECF No. 48 at 6. His additional allegations are the prosecutor made remarks (1) in opening statements that compared Villa's case to that of an individual named Ray Rice (a professional football player who was in the news for battering his domestic partner) and the defense of voluntary intoxication was an "excuse" and Nevada "really doesn't [like it]"; and (2) made remarks in rebuttal that denigrated defense counsel. ECF No. 27 at 7–8. Respondents assert they do not waive affirmative defenses and argue "trial counsel in opening repeated the [Ray] Rice reference and then stated the facts prove domestic battery," "[c]riticisms of defense counsel were substantially outweighed by the evidence presented by the victim," and Villa never presented a voluntary intoxication defense. ECF No. 51 at 2 n.1, 5, 10.

#### a.  Standard of Review

This Court previously determined that, while Ground 1 cites remarks by the prosecutor that were not included in Villa's direct appeal brief, these additional facts did not render the claim unexhausted. ECF No. 48 at 6; *See Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) ("[N]ew factual allegations do not render a claim unexhausted unless they 'fundamentally alter the legal claim already considered by the state courts.'" (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)).

The standard of review that applies to claims that were not raised before the state court, but are technically exhausted, is unclear. *See Zavala v. Gonzalez*, 537 F. App'x 684, 686 (9th Cir. 2013). However, denial of the claim under *de novo* review assures habeas relief is unwarranted irrespective of procedural default or

failure to exhaust. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (holding when the standard of review is unclear, a federal habeas court may conduct a *de novo* review to deny a petition "because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.").

Applying *de novo* review, this Court denies relief because it concludes, even if these additional remarks of the prosecutor are considered individually, or in combination with each other, or in combination with each other and the prosecutor's improper remarks addressed in Ground 1(A), the remarks did not have a substantial and injurious effect upon the determination of the verdict.

### b.      Remarks about Ray Rice[3]

In opening statements, the prosecutor argued, "this case is not about Ray Rice," and "what this defendant did in this case makes what Ray Rice did look like a game of patty cake." ECF No. 20-7 at 53–54. Because these remarks were made at the outset of the opening statements, they appear to reference discussion about Ray Rice's case during the unreported jury selection. ECF No. 20-6 at 27. Defense counsel responded by arguing Villa's case is "[i]s actually very similar to the Ray Rice case." ECF No. 20-7 at 74. Defense counsel furthermore argued, "So what is this case about? Domestic battery . . . it's basically Ray Rice. Domestic battery." *Id.* at 83. Other than in opening statements, Ray Rice was never mentioned again during the trial or closing and rebuttal arguments.

The prosecutor's remark about Ray Rice in opening statements was not improper as it was clearly intended to draw the jury's attention and focus to Villa's case and direct the jury not to confuse it with the Ray Rice case. Moreover, defense counsel seized on the remark to argue the case against Villa was the same as Rice's case, i.e., merely a domestic battery case. Not only did counsel have an adequate opportunity to respond to it in the defense opening remarks,

[3] Villa contends, at the time of his trial, Ray Rice was featured in national news as a professional football player who battered his domestic partner in a Las Vegas casino. ECF No. 27 at 8 n.1.

but counsel turned it into a defense strategy—a strategy that arguably paid off as the jury acquitted Villa of attempted murder despite the prosecutor's improper opinion argument that Villa was guilty of attempted murder.

### c.      Remarks about Intoxication

In opening remarks, the prosecutor stated the defense of voluntary intoxication was an "excuse" and Nevada "really doesn't [like it]." ECF No. 27 at 8. Those opening remarks were, however, followed by the acknowledgment that intoxication may be taken into consideration in determining purpose, motive, or intent. ECF No. 20-7 at 66–67. The jury was later instructed that it could take into consideration a person's intoxication in determining purpose, motive or intent. ECF No. 20-9 at 32. The prosecutor's opening remarks about intoxication as a defense is not misconduct because it is an accurate statement of the law.

### d.      Remarks about Defense Counsel's Closing Argument

Villa claims the prosecutor committed misconduct in rebuttal by disparaging defense counsel's arguments:

> I was pretty entertained by that closing. I could have sworn that [defense counsel] was actually arguing that maybe this didn't happen. That is the most preposterous thing I've seen in a long time. No evidence? Underinvestigated? Really? I think this was a thorough and thoughtful investigation on behalf of the sheriff's office.

> . . . .

> You can take about 80 percent of that closing that you heard from the defense and toss it right out window [sic] as pure speculation. Kept talking about maybe this, maybe that.

ECF No. 27 at 7–8. *See also* ECF No. 20-9 at 136.

With one exception, the prosecutor's remarks were not misconduct. Read in context, the remarks replied to defense counsel's lengthy arguments about the Nye County Sheriff's Department failures to investigate and collect evidence because Castillo was their colleague, that the State overcharged Villa, and that the State had no evidence corroborating Castillo's version of the incident. *See,*

*e.g., United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011) (stating prosecutors are given "wide latitude" in closing arguments); *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."). However, the remark that, "[defense lawyers] do this to us in just about every trial, try to make it about anything but whether the defendant is innocent or guilty," constitutes misconduct because it impugned the institutional role of defense attorneys. *See, e.g., Bruno Rushen*, 721 F.2d 1193, 1194 (9th Cir. 1983) (reversing for a new trial where prosecutor implied the fact that a defendant hired a lawyer is a sign of guilt and that all defense counsel are programmed to conceal and distort the truth). *See also United States v. Ollivierre*, 378 F.3d 412, 421–22 (4th Cir. 2004), *reversed on other grounds by Ollivierre v. United States*, 543 U.S. 1112 (2005) (holding prosecutor improperly impugned defense counsel and institutional role of defense attorneys by remarking prosecutor had gotten used to hearing "defense attorneys make incredible arguments . . . with a straight face . . . in spite of the tremendous amount of evidence" and it "is just incredible that [defense counsel] can say [that government had no proof other than flight evidence] with a straight face.").

### e.    *Brecht* Analysis

The record establishes the prosecutor's misconduct impugning defense counsel did not, individually, or cumulatively (when considered with the remarks that constituted misconduct in Ground 1(A), or the other remarks not amounting to misconduct alleged in Ground 1(B), or all the remarks alleged in Grounds 1(A) and 1(B)) have a substantial and injurious effect on the determination of Villa's verdict for the convictions. *See Allen*, 395 F.3d at 998; *Ollivierre*, 378 F.3d at 421–22 (holding prosecutor's misconduct in closing argument did not deprive defendant a fair trial in violation of due process as the remarks were unlikely to mislead jury given overwhelming evidence of defendant's guilt).

As explained in Ground 1(A), the jury was instructed that the statements,

opinions, and arguments of counsel were not evidence. Despite the prosecutor's remarks, including disparagement of the institutional role of defense counsel, the jury acquitted Villa of attempted murder and burglary, and rejected the prosecutor's argument for a conviction for first-degree kidnapping causing serious bodily injury, and instead convicted Villa of the lesser offense of first-degree kidnapping. Moreover, as discussed in Ground 1(A), the evidence of guilt for the crimes of conviction was overwhelming. Under a *de novo* review, Ground 1(B) must be denied as the prosecutor's remarks did not deny Villa a fair trial.

### D.    Ground 3—Failure to Preserve Evidence

Villa alleges the State failed to collect and preserve his blood and urine samples following the commission of the crime even though he repeatedly informed police his actions were the result of having consumed a stimulant (phentermine). ECF No. 27 at 11–15. He contends samples of his urine and blood were exculpatory as he could have used them to argue he lacked specific intent to commit first-degree kidnapping and domestic battery by strangulation. *Id.*

### 1.    Additional Background

The Nye County Sheriff did not take blood, hair, or urine samples from Villa when they arrested him on the night of the incident. ECF No. 20-8 at 163–66. Villa moved to dismiss the charges pretrial arguing the State failed to preserve evidence because, although Villa told detectives during his interview on the afternoon after the incident that he had been taking phentermine, they failed to obtain a blood test, and such evidence was probative of Villa's intent to commit the crimes charged. ECF No. 19-36 at 15–21. The trial court denied the motion finding the Sheriff's office was not obligated to take a blood draw from Villa because Villa told them he contacted an attorney who told him the medication was responsible for Villa's actions, but Villa denied that saying the medication had nothing to do with it. ECF No. 19-43 at 11–14.

At trial, Dr. Melvin Pohl testified for the defense regarding the use of

phentermine, an FDA approved prescription appetite suppressant used for weight loss. ECF No. 20-8 at 218–19. Dr. Pohl testified common side effects include hyperactivity, anxiety, mood swings, severe agitation, and psychosis including hallucinations and disconnections from reality. *Id.* at 221, 228–29. Less common side effects include agitation to the point of aggression or anxiety to the point of panic, in some cases distortion of a sense of reality, so that people become "paranoid, fearful of things that are not either real or a distortion of a real concern," and "can actually have hallucinations and believe things that are not so." *Id.* at 220–21. Dr. Pohl testified the effect of a drug on an individual is based on "a lot of variables," including how much of the drug was taken, food consumed, hydration, and amount of sleep the prior night. *Id.* at 223. He testified the drug may cause sweating if there's an excess of the drug in the system. *Id.* at 225.

Toxicology expert Raymond C. Kelly testified for the State that he viewed the video taken during the traffic stop on the night of the incident when Villa was arrested. *Id.* at 244–45. The sole sign of stimulant use was that Villa had "a lot of perspiration on the front of his shirt." *Id.* It was, however, difficult for Dr. Kelly to determine whether the sweating was "even from a drug at all." *Id.* In his review of many studies conducted on phentermine, he found no instances of it causing psychosis. *Id.* at 246. On cross-examination, Dr. Kelly agreed that "mood swings" "could be" consistent with phentermine use. *Id.* at 248. Dr. Kelly thought "the nature of this whole incident could be consistent with an effect of phentermine or some other stimulant." *Id.* at 249. He agreed blood or urine samples would have been helpful in reaching an opinion about the effects of phentermine on Villa. *Id.* at 250–51. On redirect, Dr. Kelly opined, based on his review of the video recording of Villa's traffic stop, that Villa did not appear intoxicated to the point he would no longer be able to act with logic and reason. *Id.* at 252.

**2.      Standards for Evaluating Preservation of Evidence**

In *California v. Trombetta,* 467 U.S. 479 (1984), the Supreme Court

considered whether Due Process under the Fourteenth Amendment "demands that the State preserve potentially exculpatory evidence on behalf of defendants," in particular, "whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions." *Id.* at 481. The Supreme Court concluded the failure to preserve breath samples did not violate Due Process because officers did not destroy the samples "in a calculated effort to circumvent the disclosure requirements established by" *Brady*; rather, they acted "'in good faith and in accord with their normal practices. . ..'" *Id.* at 488 (quoting *Killian v. United States*, 368 U.S. 231 (1961)).

In *Trombetta*, the Supreme Court stated, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488. "[T]o meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489 (internal citation omitted).

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court granted certiorari to consider "the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that *might be useful* to a criminal defendant." *Id.* at. 52 (emphasis added). The Court held "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad

faith." *Id.* at 56 n.* (citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)). "Potentially useful evidence, as defined in *Youngblood*, is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (quoting *Youngblood*, 488 U.S. at 57).

Under NRS § 193.220, "whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent." While voluntary intoxication can negate specific intent, a defendant "must show not only the defendant's consumption of intoxicants, but also the intoxicating effect of the substances imbibed and the resultant effect on the mental state pertinent to the proceedings." *Nevius v. State*, 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985). For involuntary intoxication, a defendant must show (1) he took the intoxicating substance against his will, (2) his intoxication was the result of the intoxicating substance and not some other substance or mixture of substances, and (3) he was so mentally deficient as not to "know or understand the nature and capacity of his act, or that he could not appreciate the wrongfulness of his act." *See Grey v. State*, 124 Nev. 110, 122 n.22, 178 P.3d 154, 163 n.22 (2008).

### 3. State Court Determinations

On direct appeal the NSC rejected this claim finding Villa failed to show the bloodstream evidence was material because he did not show a reasonable degree of probability such evidence would have led to a different trial outcome:

> [V]illa argues that the State improperly failed to preserve potentially exculpatory evidence in failing to take a blood draw when he gave his police statement. If the State fails to gather evidence and the defense shows that the evidence was material, relief is warranted when the failure to gather the evidence was the result of gross negligence or a bad faith effort to prejudice the defendant. *Daniels v. State*, 114 Nev. 261, 267, 956 P.2d 111, 115 (1998). Villa argues that

a blood draw would have demonstrated an elevated level of phentermine in his bloodstream, showing that he was under the influence of that medication during the incident. We conclude, however, that Villa has failed to show that the bloodstream evidence was material because he has not shown a reasonable degree of probability that the evidence would have led to a different trial outcome when (1) he appeared cogent and not intoxicated when arrested shortly after the incident and during the police statement the next day, (2) the police statement was taken 18 hours after the incident and no evidence was produced regarding phentermine's dissipation rate and showing the significance that such a delayed sample could have, (3) the State's expert testified that he had found no reported instances of phentermine causing psychosis, and (4) overwhelming evidence supported Villa's guilt. *See id.* Accordingly, this claim lacks merit.

ECF No. 20-30 at 4–5.

### 4. Analysis of Ground 3

At the time of his arrest, Villa did not mention his consumption of medication. ECF No. 20-7 at 232. The Deputies and Detective who interviewed Villa during the traffic stop on the night of the incident were trained to recognize symptoms of stimulant use, e.g., fidgetiness or restlessness, but none noticed such symptoms, except Detective Murphy who acknowledged perspiration can be a symptom of stimulant consumption. Although the Deputies and Detective saw Villa was sweaty, they observed he was "pretty calm and straight," and not "jittery." ECF Nos. 20-7 at 212–15, 248–49; 20-8 at 15–16, 66. The following afternoon, in his interview with Sheriff's detectives, Villa told them he spoke with an attorney, who told him his actions were the result of having taken phentermine, but Villa assured the Detectives the drug was not the cause of his actions. ECF No. 20-8 at 147.

Under the circumstances, Villa failed to demonstrate the Sheriff acted in bad faith by failing to preserve blood or urine evidence as he did not establish the officers who stopped him knew that he had taken a stimulant or that a delayed sample taken during his interview the following afternoon would have provided potential usefulness evidence. Accordingly, the NSC was objectively reasonable in its determination that Villa failed to establish the evidence was not taken or

was destroyed in bad faith. Ground 3 is therefore denied.

### C.   Ground 4(B)—Ineffective Assistance of Trial Counsel

Villa alleges trial counsel provided ineffective assistance in violation of the Sixth Amendment by failing to object to prosecutorial misconduct in closing arguments. ECF No. 27 at 19.

On postconviction review, the Nevada Court of Appeals determined:

> [V]illa claimed counsel should have objected to prosecutorial misconduct committed during the State's rebuttal argument in closing and moved for a mistrial. Villa did not specify which comments amounted to prosecutorial misconduct or why he felt they constituted misconduct. He also failed to support his mistrial argument with argument or authority. His bare claim thus failed to demonstrate counsel was deficient. *See Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987). And because the Nevada Supreme Court concluded that there was overwhelming evidence of Villa's guilt, Villa failed to demonstrate a reasonable probability of a different outcome had counsel objected.

ECF No. 20-48 at 3–4.

As discussed in Ground 1, there is overwhelming evidence of Villa's guilt for the counts of conviction. Thus, even if counsel successfully objected to the remarks of the prosecutor (as alleged in Grounds 1(A) and 1(B)), there is no reasonable probability the result of the trial would have been different. The NCA's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. Ground 4(B) is therefore denied.

### IV.   Certificate of Appealability

This is a final order adverse to Villa. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a certificate of appealability ("COA"). Therefore, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *see also Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *See id.* Applying these standards, this Court finds a certificate of appealability is warranted for Ground 1.

**V.     Conclusion**

Therefore, **IT IS HEREBY ORDERED** that Petitioner Leslie Villa's first amended petition for writ of habeas corpus (ECF No. 27) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED for Ground 1**.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to substitute John Henley for Respondent William Hutchings, enter judgment accordingly, and close this case.

DATED THIS 10th day of February, 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE